**STREIGHT RADIO AND TELEVISION, INC., an Indiana corporation, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 12938.

United States Court of Appeals Seventh Circuit.

July 28, 1960.

John H. O'Hara, Indianapolis, Ind., Knox, O'Hara & Krise, Indianapolis, Ind., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Grant W. Wiprud, Attorney, Tax Division, U. S. Dept. of Justice, Washington, D. C., Lee A. Jackson, Meyer Rothwacks, George F. Lynch, Attorneys, Department of Justice, Washington, D. C., for respondent.

Before HASTINGS, Chief Judge, and DUFFY and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Streight Radio and Television, Inc., an Indiana corporation, petitioner, seeks a review of a decision of the Tax Court of the United States, 33 T.C. ——,[1] that there is a deficiency of $14,245.82 in income tax owing by petitioner for the fiscal year ending October 31, 1950.

The basic facts are not in dispute.

During the taxable year, petitioner was engaged in the business of selling television sets and of servicing the sets sold.

Most of the sets sold by petitioner were designed by their manufacturers so that, every 2 to 6 months, the chassis would have to be removed, and the tuners, glass, and picture tube cleaned. Petitioner rendered this service upon call by its customers. Less than 100 of the several thousand sets sold during the taxable year did not require service of one kind or another.

In addition to its advertised list price, petitioner offered an "Installation and Service Contract" for an additional consideration, which varied in amount from $65 to $100, depending on the make and model of the receiver sold. Petitioner added the charge for the service contract to the list price to arrive at a single total sales price for the set. The customer was also given a sales ticket, which reflected the total sales price, as a receipt. A delivery card was made up for each television set sold during the taxable year.

Respondent's agents examined 25 sales tickets which represented 2 days' sales; 18 of these tickets did not contain any reference to any warranty. However, 5 of these latter 18 tickets were checked by respondent's agent against the corresponding 5 delivery cards; 1 of those delivery cards showed a 90-day service and parts warranty, with a 1-year warranty on the picture tube, another disclosed a "coupon" warranty, 1 showed a 1-year parts warranty, and 2 provided for a 1-year service warranty. Respondent's agent examined the delivery cards for customers with initials A through BE, approximately 200 cards. All but 22 of these delivery cards disclosed a 1-year service warranty. Of those 22 cards, 1 did not record any warranty, 1 recorded a 1-year parts warranty, and 20 disclosed 90-day warranties, either on parts or service, or on both.

A few sets sold for cash were sold without any service contracts. All but 10 per cent of the sets sold by petitioner

during the year in question were sold with a 1-year service contract.

Petitioner's main purpose in offering the service contracts was to induce potential customers to purchase their sets from it. Petitioner was not in the business of servicing, and it did not service television sets sold by other concerns, as it knew from the experience of such competitors that such a service business was not profitable.

Louis Goedecke, an accountant, made monthly posting entries from monthly summaries to the general ledger of petitioner, and prepared petitioner's income tax returns. The charges for service contracts having been included in total sales without allocation, Goedecke com-

puted the amount thereof to be deferred, in the manner indicated in the footnote.[2]

During the taxable year, petitioner's television sales and charges for service contracts, less refunds in the amount of $7,908.42, totaled $1,041,649.50. This amount does not include other unexplained sales of approximately $2,905, and service and repair income not covered by service contracts in the amount of $37,890.26. At the end of the fiscal year, total uncollected contracts receivable had been reduced to $287,049.30.

The Tax Court found that Goedecke used a "Schedule of Deferred Income 10–31–50",[3] in preparing petitioner's tax return.

2. While the charges for the service contracts varied in amount from $35 to $100, most of the contracts were sold for $65. The list prices of the sets varied from $249 to $725. It was determined that the service contract charge, on the average, constituted 14.7 per cent of the total price. This computation was made without weighing the different total prices according to the relative quantity of each type of receiver sold. Goedecke then took 15 per cent of each month's total sales as representing amounts charged for the service contract. Antenna and labor costs of installation, covered by the service contract, were estimated to be $22.50 per set installed, or almost one-third of $65,

which was assumed to be the total amount charged for the service contract. The amounts charged for the service contracts for each month were accordingly reduced by one-third, on the theory that the amount of $22.50 of the $65 charged for the contract represented income earned at the time of installation. The remaining balance for each month, which thus equaled 10 per cent of television sales for the month, was then divided by 12, the service contract period, in months, and the resulting monthly figure was multiplied by the number of months the service contracts would remain in effect after the close of the fiscal year. The total of these figures was then deferred as unearned income.

3. This schedule is as follows:

| Months of year | Total sales | Service contract income 15% | Antenna installation ⅓ | Balance | Per month | Months remaining next year | Deferred income * |
|---|---|---|---|---|---|---|---|
| Nov. | 140,474.56 | 21,071.18 | 7,023.87 | 14,047.31 | — | — | — |
| Dec. | 147,916.04 | 22,187.40 | 7,395.84 | 14,791.56 | 1,232.63 | 1 | 1,232.63 |
| Jan. | 52,928.44 | 7,939.26 | 2,646.42 | 5,292.84 | 441.07 | 2 | 882.14 |
| Feb. | 107,203.60 | 16,080.54 | 5,360.22 | 10,720.32 | 893.36 | 3 | 2,680.09 |
| Mar. | 87,972.77 | 13,195.91 | 4,398.71 | 8,797.20 | 733.10 | 4 | 2,932.42 |
| Apr. | 65,175.69 | 9,776.35 | 3,258.79 | 6,517.56 | 543.13 | 5 | 2,715.65 |
| May | 52,632.35 | 7,894.85 | 2,631.65 | 5,263.20 | 438.60 | 6 | 2,631.61 |
| June | 42,818.65 | 6,422.79 | 2,140.95 | 4,281.84 | 356.82 | 7 | 2,497.74 |
| July | 61,621.58 | 9,243.23 | 3,081.11 | 6,162.12 | 513.51 | 8 | 4,108.08 |
| Aug. | 81,861.70 | 12,279.25 | 4,093.09 | 8,186.16 | 682.18 | 9 | 6,139.62 |
| Sept. | 93,313.38 | 13,997.00 | 4,665.68 | 9,331.32 | 777.61 | 10 | 7,776.10 |
| Oct. | 107,730.74 | 16,159.61 | 5,386.61 | 10,773.00 | 897.75 | 11 | 9,875.25 |
| Total | 1,041,649.50 | 156,247.37 | 52,082.94 | 104,164.43 | — | — | 43,471.33 |

* Headings of columns added or clarified.

The Tax Court found that, according to the books and records and income tax returns of petitioner, its television, service contract, and other service and repairs sales, and the costs of producing those sales, for its 1950 and 1951 fiscal years, were as follows:

| | Fiscal year ended Oct. 31 | |
| | 1950 | 1951 |
|---|---|---|
| Total Sales: | | |
| Television Sales (includes Service Contracts) .......... | $1,044,554 | $458,712 |
| Service and Repairs ... | 37,890 | 84,417 |
| Total: ........ | 1,082,444 | 543,130 |
| Service Sales: | | |
| Service Contracts .... | 156,247 | 68,807 |
| Less: "Service Guarantee" ......... | 43,471 | (21,735) |
| Other Services and Repairs ............ | 37,890 | 84,417 |
| Total: ........ | $150,666 | $174,959 |
| Service Costs: | | |
| Materials .......... | 60,266 | 69,984 |
| Labor ............. | 87,540 | 91,693 |
| Truck Maintenance ... | 3,720 | 4,989 |
| Depreciation ........ | 2,033 | 3,336 |
| Total: ........ | 153,559 | 170,002 |
| Service Gain (or loss) .. | (2,893) | 4,957 |

---

The manufacturers of the sets warranted the picture tube for an undisclosed period, and the other tubes for 3 months.

The Tax Court further found as follows:

"On its return for the taxable year, petitioner deferred the amount of $43,471.33 charged for service contracts by including that amount in its cost of goods sold. In his notice of deficiency, respondent determined 'that the deduction for service guarantee * * * created by setting up a contingent liability account * * * is not an allowable deduction' and increased petitioner's income accordingly.

\* \* \* \* \* \*

"At the time of entering into the service contracts, petitioner acquired a substantially fixed and unconditional right to receive the amounts charged therefor."

Petitioner, an accrual basis taxpayer, contends that its method of deferral was not artificial but had a reasonable relationship to the services to be performed, that the "claim of right" doctrine is not applicable to the instant case because: (1) the income was not earned in the year of receipt and (2) the income was not, in fact, received in the year in which the contracts were executed, and further, that respondent does not have authority to change the method of account-

ing of a taxpayer except when the method employed does not clearly reflect income.

On the other hand, respondent urges that it is the right to receive and not the actual receipt of an item of income which determines its includibility in gross income under the accrual method of accounting, regardless of whether it is ultimately retained or offset by expenditures, that the concept of an annual accounting requires that the computation of income for tax purposes show the net result of all the taxpayer's transactions during the year rather than the net result of any particular transaction which may extend beyond that period. He further maintains that the "claim of right" doctrine is primarily a rule designed to determine *when* and not *whether* receipts are taxable; it is applicable to accrual basis taxpayers.

The principles governing this case were discussed in Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 77 S.Ct. 707, 712, 1 L.Ed.2d 746. A similar question arose in that case where the Club had collected membership dues one year in advance, for which the members were entitled to various club services. While the dues when collected were not segregated from the Club's general funds but were used for general corporate purposes, it appeared that for bookkeeping purposes the dues upon receipt were credited to an account, carried as a liability account and designated "Unearned Membership Dues". During the first month of membership and each of the following eleven months, one-twelfth of the amount paid was credited to an account designated "Membership Income". The Club reported in its income tax returns the amount credited in each year to this account.

The Supreme Court pointed out, at page 188 of 353 U.S., at page 712 of 77 S.Ct., that the Commissioner determined that the Club received the prepaid dues under a claim of right, without restriction as to their disposition, and therefore the entire amount received in each year should be reported as income.

The Court, at page 189 of 353 U.S., at page 712 of 77 S.Ct., said:

"The petitioner does not deny that it has the unrestricted use of the dues income in the year of receipt, but contends that its accrual method of accounting clearly reflects its income, and that the Commissioner is therefore bound to accept its method of reporting membership dues. We do not agree. Section 41 of the Internal Revenue Code of 1939 required that '[t]he net income shall be computed * * * in accordance with the method of accounting regularly employed in keeping the books * * * but * * * if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * * ' [4] The pro rata allocation of the membership dues in monthly amounts is purely artificial and bears no relation to the services which petitioner may in fact be called upon to render for the member. Section 41 vests the Commissioner with discretion to determine whether the petitioner's method of accounting clearly reflects income. We cannot say, in the circumstances here, that the discretionary action of the Commissioner, sustained by both the Tax Court and the Court of Appeals, exceeded permissible lim-

4. 26 U.S.C.A. § 41, 1939.
"The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such meth-

od of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * * "

its. See Brown v. Helvering, 291 U.S. 193, 204–205 [54 S.Ct. 356, 361, 78 L.Ed. 725]."

In Weiss v. Wiener, 279 U.S. 333, 335, 49 S.Ct. 337, 73 L.Ed. 720, the Court said:

> "The income tax laws do not profess to embody perfect economic theory. They ignore some things that either a theorist or a business man would take into account in determining the pecuniary condition of the taxpayer. * * *"

In Guaranty Trust Co. of New York v. Commissioner, 303 U.S. 493, 498, 58 S. Ct. 673, 676, 82 L.Ed. 975, it is said:

> " * * * It is true that the acts of Congress taxing income have consistently laid the tax upon the net income received by or accrued to the taxpayer in a 'taxable year,' which is either the calendar year or a different fiscal year, as the taxpayer may elect. But they have never undertaken to limit the income taxable in any one year to that derived from the taxpayer's activities occurring in that or any other single year. The items of gross income and of allowed deductions to be included in the income return, are those of the taxpayer for his taxable year, even though they may have resulted from or be affected by his business transactions of other years. * * *"

If, instead of a system of annual accounting, a basis of finally ascertained results of particular transactions is to be substituted, Congress and not the courts must provide it. Burnet v. Sanford & Brooks Co., 282 U.S. 359, 367, 51 S.Ct. 150, 75 L.Ed. 383; Baird v. Commissioner, 7 Cir., 256 F.2d 918, 924, affirmed Commissioner v. Hansen, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360.

For the reasons herein expressed, the decision of the Tax Court is affirmed.

Affirmed.