L. L. CROSBY AND LILLIAN CROSBY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

STANFORD CROSBY AND SHIRLEY CROSBY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 67195, 67218. Filed February 9, 1961.

*Samuel Kaufman, Esq.*, for the petitioners.
*Gerald Backer, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined deficiences in the income taxes of the petitioners, as follows:

| Docket No. | Petitioners | Taxable year | Deficiency |
|---|---|---|---|
| 67195 | L. L. Crosby and Lillian Crosby | 1954 | $20,152.89 |
| 67218 | Stanford Crosby and Shirley Crosby | 1954 | 16,164.73 |

Only part of the above deficiencies are in controversy.

The cases were consolidated for trial.

The sole issue for decision is: Whether a partnership of the principal petitioners, which engaged in treating buildings for the extermination of termites and other pests, is entitled to exclude from its partnership income of the taxable year, a substantial portion of its gross receipts for such year, on the ground that this represents "prepaid income" attributable to future inspections and possible future services under the warranties and guarantees given with respect to its initial extermination work.

### FINDINGS OF FACT.

Some of the facts have been stipulated. The stipulation of facts, together with all exhibits identified therein, is incorporated herein by reference.

Petitioners L. L. Crosby and Lillian Crosby are husband and wife, residing in Pittsburgh, Pennsylvania; and, likewise, Stanford Crosby and Shirley Crosby are husband and wife, residing in the same city. Each of these couples filed a joint income tax return for the year 1954, with the district director of internal revenue at Pittsburgh.

The two petitioner husbands, L. L. Crosby and Stanford Crosby, were during the taxable year, the sole and equal members of a partnership which they operated in Pittsburgh, under the name of the Termitol Company (hereinafter called Termitol). This partnership was organized in January 1, 1952, to succeed to the business of a corporation of similar name which had theretofore been operated by said petitioners. One of the principal activities of said partnership was that of carrying on a so-called pest control and extermina-

tion business, which included the chemical treatment of customers' buildings and areas adjacent thereto, for the extermination of termites. The manner in which the partnership conducted such phase of its business, was substantially as follows.

Upon request of a building owner who suspected the presence of termites, Termitol would inspect the premises without charge; and, if such inspection revealed termite infestation, the partnership would prepare and submit to the potential customer an offer to chemically treat the property at a fixed rate per foot, and also to warrant its work against reinfestation for a period of 5 years. If such offer was accepted, the partnership would enter into a written contract with the customer, covering the work to be done. Not all of these preliminary inspections and offers resulted in the obtaining of contracts. Termitol's salesmen made the preliminary inspections; and they were compensated by the partnership on the basis of commissions, equal to 10 percent of the total prices specified in the contracts which they obtained.

The several termite extermination contracts which Termitol entered into with customers differed as to the nature of and extent of the initial treatment services to be rendered thereunder; as to the prices specified for the partnership's initial work; and also as to the prices specified for extension of the initial 5-year warranty period to cover an additional 5-year period. However, all of these treatment contracts (called initial contracts) included the following provisions here material:

(1) The Termitol Company hereby agrees to do the work specified in the ESTIMATE * * * and the undersigned, owner of the property, hereby authorizes and agrees to accept said work and to pay therefor the prices and at the times specified * * *.

(2) The prices quoted in said ESTIMATE cover all material and first class workmanship. * * *

\* \* \* \* \* \* \*

(5) The Termitol Company hereby agrees to service the property described in this contract for a period of five (5) years from the date of completion of the work covered hereby and if subterranean termites reinfest the said premises at any time within the said period agrees to render, without additional charge, such chemical treatment as in its opinion may be necessary to give the protection herein contemplated. The owner of the property shall have the option of extending this agreement on or before the expiration hereof for an additional term of five (5) years if agreeable to both parties, upon payment to The Termitol Company of an annual sum in advance of [a specified dollar amount] and unless notice to the contrary be given by the owner to the undersigned on or before the expiration hereof said option shall, at the election of The Termitol Company, be deemed to have been exercised.

(6) The owner of the property agrees to fully co-operate with The Termitol Company during the lifetime of this agreement and to maintain the treated area free from any factor or condition contributing to infestation by subterranean termites, such as moisture from drains and faulty plumbing, firewood,

trash or wood in direct contact with the ground. Any violation of this covenant shall relieve The Termitol Company from any obligation under Section 5 of this CONTRACT. The owner of the property further agrees that any additions or alterations to the building covered by this CONTRACT during the aforesaid five year period shall not be covered by the provisions of Section 5 of this CONTRACT.

(7) The Termitol Company will issue, upon completion of the work covered hereby, to the owner of the property a bond executed by it * * * warranting as therein stated in favor of the party to whom it is issued only.

The above-mentioned "bond" which Termitol issued to a customer upon completion of the initial work under his contract, was on a printed form bearing the caption, "Warranty Bond." It was executed by the partnership alone, without use of any surety. In such instrument, Termitol certified that the customer's premises had been protected through the initial treatment, against the attack of subterranean termites; and that if such termites reinfested the premises at any time within 5 years thereafter, it would render without additional charge, all re-treatments which in its opinion might be necessary to give the contemplated protection. The instrument further provided that such "guarantee" would run only in favor of the customer for whom the initial work was done.

Termitol, in addition to entering into initial contracts of the type above mentioned, also entered into so-called renewal contracts, under which it agreed that, for a specified consideration, the initial 5-year guarantee period would be extended for a further 5-year period. Each of such renewal contracts included provisions similar to the above-quoted provisions of the initial contracts; and in connection with these renewals also, there was issued a "Warranty Bond" of the type above described.

In the case of one specimen initial contract for 1954 which was received in evidence, the price for the original treatment work was $496, all of which was paid upon completion of said work; and the price specified for an additional 5-year extension of the initial "guarantee," was "an annual sum in advance" of $24.80. In the case of one specimen renewal contract received in evidence, which was executed in 1954 with respect to an initial contract that had been entered into in 1949 by the partnership's predecessor corporation, the price of the initial contract which had been paid in full in 1949 was $300; and the price for the 1954 renewal of the guarantee provision, for an additional 5-year period, was $97.50 for the entire renewal period.

Neither the terms of the initial contracts nor those of the renewal contracts restricted Termitol in any manner as to its use or application of any of the amounts which it received from customers.

The treatments of properties, which Termitol made under its initial extermination contracts, were applied by a service crew con-

sisting of a crew leader and two helpers. Such crew supplied whatever materials and equipment were necessary, including chemical, drills, and pressure pumps. They trenched the ground surrounding the foundation of the particular building, and treated the same with chemicals. They also drilled holes in the floor of the basement if any, in the foundation walls, and in any wood surfaces that were in contact with the ground; and they then injected these with chemicals applied under pump pressure.

In many cases, it was not necessary for Termitol to re-treat the building involved during the 5-year guarantee period mentioned in its contracts. The need for any re-treatment depended upon a number of factors, including: The particular construction of the building; the character of the chemicals originally used; negligence of crew members, or the incidence of human error, in the initial treatment process; the presence of mechanical or structural barriers in the building which prevented the chemicals from taking effect; and whether the geographical situs of the structure was in an area of major infestation. Whenever re-treatments were necessary, the work done was similar to that in the initial treatment, except that the reinfested areas were usually smaller, and that it frequently was unnecessary to utilize the full service crew or the pressure pumps.

During the year 1954, Termitol entered into 731 initial contracts with customers for extermination work, at prices aggregating $265,935; and also during said year, it entered into 37 renewal contracts with customers for extension of the original 5-year guarantee periods, at prices aggregating $4,622. Said contract prices, which total $270,557, included charges for repairs aggregating $1,613. In addition, Termitol made sales of insecticides to customers in the year 1954, in the aggregate amount of $1,939.

The books of account of Termitol were kept, and its partnership return of income for the year 1954 was filed, on an accrual basis of accounting. A summary of Termitol's accounts receivable at the dates hereinafter indicated, is in substance as follows:

| | | |
|---|---:|---:|
| Accounts receivable as of Jan. 1, 1954 | | $12,980 |
| Charges to customers in 1954: | | |
|     Initial contracts | $265,935 | |
|     Renewal contracts | 4,622 | |
|     Insecticide sales | 1,939 | 272,496 |
|       Total | | 285,476 |
| Less credits in 1954 | | 282,020 |
| Balance as of Dec. 31, 1954 | | 3,456 |

The above credits for 1954, aggregating $282,020, were for the most part either cash payments from customers, or cash proceeds of customers' notes discounted with local banks. The moneys received from

customers in 1954 were not placed in any special bank account, but were commingled with Termitol's general funds. Termitol's cash, accounts receivable, and inventory balances at January 1, 1954, were $2,514, $12,980, and $2,860, respectively; and at December 31, 1954, the cash, accounts receivable, and inventory balances were $2,177, $3,955, and $2,489, respectively.

At no time prior to the year 1954 which is here involved, did Termitol exclude from its partnership income any of the gross receipts of its business, as being "prepaid income" deferrable to subsequent years. However, in its partnership return of income for the year 1954, it reported gross receipts from its business of $272,496.82; and it then excluded therefrom as "prepaid income," the amount of $78,622.28.

The respondent, in the notices of deficiency issued to the petitioner partners herein, disallowed all of said exclusions of so-called prepaid income; included the amount so excluded in the partnership income for the year 1954; and increased the amounts of the partners' distributive shares of the income of said partnership, in the amount of $39,311 for each of said petitioner partners.

The manner in which the petitioner partners computed said amount of $78,622.28, which they excluded from the 1954 gross receipts of the partnership, on the 1954 partnership return of income, was as follows:

72 percent of the above-mentioned amount of $265,935 which the partnership accrued in 1954 as gross receipts from initial contracts with 731 customers, was credited on the partnership's accounts to its income of said year; and the remaining 28 percent of said amount, or $74,462, was deferred to later years and credited to an account designated "Prepaid income." Two-ninths of this latter amount of $74,462 was credited to income of each of the years 1955 through 1958; and one-ninth thereof was attributed to the year 1959.

10 percent of the above-mentioned amount of $4,622 which the partnership accrued in 1954 as gross receipts from its renewal contracts, was credited to the partnership income of said year; and the remaining 90 percent of said amount, or $4,160, was deferred to later years and credited to an account designated "Prepaid income." One-fifth of this latter amount of $4,160 was credited to income of each of the years 1955 through 1958; and another one-fifth thereof was attributed to the year 1959.

All of the above-mentioned amounts which the partnership regarded to be "prepaid income," and also all of the ratios for deferral and all of the amounts deferred to subsequent taxable years, were based on estimates which were unsupported by adequate records or adequate cost accounting. The partnership did not maintain any

cost accounting system of any kind, pertaining to reinspections and re-treatments of properties under the warranties and guarantees of its initial contracts. As regards the reinspections, it was the intention of the partnership that these should be made annually; but such reinspections were not related to fixed dates, and frequently were deferred or omitted due to the pressure of other business, or the fact that customers were away from home, or that the customer's property was sold prior to the expiration of the guarantee period. Also, inspectors were negligent about making reports to the partnership's main office; such office had no procedure for controlling the inspection work of the partnership's operating department, or for requiring accurate inspection reports to be made; and such inspection reports as the main office did obtain, were too incomplete and inadequate to present a true and complete record of the total inspection work done in any particular year.

Likewise, as regards re-treatments of properties under the guarantee provisions of the partnership's initial contracts and renewal contracts, the partnership records were incomplete and unreliable. Accounts were not kept in such manner as to show the costs of particular jobs, or the number or extent of the re-treatment services rendered, either per contract or per year. And part of the reinspections and re-treatments actually made in 1954 were made in respect of contracts executed in preceding years, either by the partnership or by its predecessor corporation, at times when no deferral of costs or income was made to the year 1954.

Termitol's method for determining those portions of its 1954 gross receipts which it attributed to "prepaid income," and also for determining the ratios and the amounts deferred to years subsequent to 1954, was artificial and bore no relation to the services which the partnership might in fact be called upon to render in subsequent years, pursuant to warranties and guarantees included in its initial and renewal contracts.

Termitol's method of accounting for the year 1954, under which it excluded part of its gross receipts from its income of said year, for deferral to the incomes of subsequent taxable years, did not clearly reflect its partnership income for the year 1954.

OPINION.

Each of the partner-petitioners herein has assigned error in respondent's action in restoring to the partnership income for the year 1954, those portions of its gross receipts for said year which it excluded from such income as representing "prepaid income" for future services that the partnership might be called upon to perform in subsequent years, under the warranty and guarantee pro-

visions of its pest extermination contracts. Petitioners contend that such exclusions from income should be approved; or, in the alternative, that the deferred amounts should be allowed as deductions for the year 1954, "as a reserve to cover costs to be incurred in the later years." We do not agree with either of these contentions.

The situation here presented is distinguishable from that where payments are received or accrued in one year, pursuant to contracts under which the initial services contracted for are to be performed in definite amounts or at specific times in subsequent years. Rather, here the initial services were fully performed in the year when payments therefor were received or accrued; and the only future services remaining, other than reinspections at indefinite times, were those which the partnership might, or might never, be called upon to perform pursuant to the guarantee of its initial work. Also, we have hereinbefore found as facts: That the partnership did not maintain adequate or complete records regarding its reinspection services, or any cost accounting records whatever relating to the re-inspections or re-treatments of property under its guarantees and warranties; that its determination of the amounts excluded from its 1954 income as "prepaid income," and also its determination of the ratios and the amounts allocated to subsequent years, were artificial and bore no relation to the services which it might be called upon to render in subsequent years; and that the method of accounting which it employed in so excluding and deferring income did not clearly reflect its income for the year 1954 which is here involved.

In *Automobile Club of Michigan* v. *Commissioner*, 353 U.S. 180, the Supreme Court held, under facts similar to those here involved, that section 41 of the Internal Revenue Code of 1939 vests the Commissioner with discretion to determine whether the taxpayer's method of accounting clearly reflects income; and that it could not say, in the circumstances there presented, that the discretionary action of the Commissioner exceeded permissible limits. That Court further pointed out, in a footnote to its opinion, that the cases of *Beacon Publishing Co.* v. *Commissioner*, 218 F. 2d 697, and *Schuessler* v. *Commissioner*, 230 F. 2d 722, were distinguishable on their facts, for reasons stated.

It is our conclusion, after considering and weighing all the evidence in the instant case, that the rationale of the Supreme Court's opinion in the above-mentioned case is applicable also to the facts of the present case; and that the decision therein is here controlling.

We decide the issue before us in favor of the respondent.

*Decisions will be entered under Rule 50.*