WILLIAM O. McMAHON, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 672–63. Filed December 1, 1965.

*Dean S. Butler*, for the petitioner.
*Herbert T. Ikazaki*, for the respondent.

HOYT, *Judge:* Respondent determined deficiencies in petitioner's[1] income tax as follows:

---

[1] During the tax periods in question and when the notice of deficiency was issued petitioner's corporate name was Automobile Invoice Service Co. The name was changed to William O. McMahon, Inc., subsequent to the filing of the petition herein and the caption was amended accordingly.

| Period | Deficiency |
|---|---|
| Sept. 6, 1957–Nov. 30, 1957 | $71,157.58 |
| Fiscal year ended Nov. 30, 1958 | 2,124.11 |
| Fiscal year ended Nov. 30, 1959 | 5,273.54 |
| Total | 78,555.23 |

The issue for decision is whether certain cash receipts were properly excluded from taxable income by petitioner in each of the periods here involved and income recognition properly deferred beyond the period of receipt. We must determine whether the receipts involved constituted "prepaid subscription income * * * from a subscription to a newspaper, magazine, or other periodical" within the meaning of section 455 of the 1954 Code [2] and whether petitioner's method of accounting clearly reflected income for Federal income tax purposes. Respondent concedes that if he prevails on these issues petitioner's income for the fiscal period ended November 30, 1957, should be reduced by $42,865, the amount received prior to September 6, 1957, by petitioner's predecessor sole proprietorship and included by petitioner in its income tax return for the fiscal period ended November 30, 1957.

### FINDINGS OF FACT

Petitioner was organized as a corporation under the laws of the State of California on September 6, 1957. Until the time of the sale of its principal business on or about July 15, 1963, it conducted its business and maintained its principal offices in Bakersfield, Calif. Prior to petitioner's incorporation that portion of petitioner's business with which we are herein concerned was conducted by William O. McMahon as a sole proprietorship. Following incorporation McMahon was petitioner's sole shareholder until his death on March 25, 1963.

Concurrently with its incorporation petitioner adopted and has maintained a fiscal year ending November 30, and has filed all its Federal income tax returns with the district director of internal revenue, Los Angeles, Calif., in accordance with said fiscal year. For all of the periods herein involved petitioner kept its books and prepared its income tax returns on an accrual basis except as herein stated to the contrary.

Petitioner's principal business, and the operation that produced the income with which we are here concerned, was the compilation and distribution by mail to its customers of charts containing confidential information regarding dealer cost of automobiles and auto-

---

[2] All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.

mobile accessories.[3]   Its customers were banks, financial institutions, and others having a regular need for this kind of information.   Petitioner referred to and advertised its business as a "service" offered by "subscription"; it referred to its customers as "subscribers."

The principal business of petitioner (hereinafter sometimes referred to as automotive information service, or service) was operated as follows: In the automobile industry a new-car year commences each September upon the public introduction of the new model cars.[4] At or about the beginning of each new-car year petitioner would prepare and print (on standard 8½- by 11-inch paper) price information "charts" for each make and model car of the new-car year.   Thereafter throughout the new-car year, if any new models or accessories were introduced or if any changes were made by the manufacturers in previously announced prices or models, petitioner would print a "supplement" chart within 15 days of the factory announcement of each such change.

Petitioner sold its service to customers on the basis of a period corresponding with the new-car year.   It received the great majority of its orders during the first 3 months of the new-car year (which corresponded with the last 3 months of petitioner's fiscal year); orders were accompanied with payment of the lump-sum sales price or with an agreement to be billed therefor.   Upon receipt of an order petitioner would mail to the customer a looseleaf manual consisting of a plastic looseleaf binder and transparent plastic page protectors in which were inserted the price information charts for all of the automobile makes, models, and accessories introduced for the new-car year.[5]

In addition, upon receipt of an order, petitioner became obligated to furnish the customer a supplement to the manual within 15 days of announcement of any new accessory or model or any price changes *if* any such changes should occur.   This contingent obligation continued throughout the new-car year until the beginning of the next new-car year.   The lump-sum price received for the service included the manual and any *necessary* supplements.   The issuance of supplements was solely dependent upon the occurrence of price and/or model changes; the customer was not guaranteed any fixed number of supplements, and if there were no price or model changes throughout the balance

---

[3] During the 2 fiscal years 1958 and 1959, petitioner also conducted a used car business which resulted in net operating losses, and in the 1959 fiscal year it operated a citrus farm, which operation also resulted in a net operating loss.

[4] The last 3 months of petitioner's fiscal year encompass approximately the first 3 months of the new-car year (September, October, and November).   The exact dates of commencement of new-car years vary depending upon the dates of new-car showings.

[5] Repeat customers, referred to by petitioner as "renewal subscribers," were sent only the new batch of charts for the new-car year, to be inserted into the old binder.   They were sent new binders only every 3 years or upon request.   At one time new binders were sent with each renewal order without the need for customer request.   Whether this change in practice occurred before, during, or after the tax periods here in question is not determinable from the record.

of a new-car year, the customer would receive no supplements. The supplements were never furnished by petitioner to its customers at stated or regular intervals of time.

Petitioner's experience during the periods in question was that several supplements had to be mailed each period. During its short fiscal period September 6 to November 30, 1957, it was necessary to distribute 46 supplements in 5 mailings. In its fiscal years ended November 30, 1958 and 1959, 83 and 85 supplements, respectively, were distributed, by 12 and 8 separate mailings. It was commonly necessary for petitioner to prepare as many as 50 different variations of each insert by virtue of the fact that there were approximately 50 zones throughout the United States for the determination of freight variances which would affect the prices, and also because of varying State law requirements which might affect the required equipment on automobiles.

In the 2 full fiscal years here involved more than 70 percent of petitioner's annual income was received in September, the first month of the new-car year, and more than 80 percent was received in the months September through November, the first 3 months of the new-car year and the last 3 months of petitioner's fiscal year. During the years before us petitioner maintained a general checking bank account and deposited therein all receipts from its service business. There were no restrictions on this account with respect to deposits or withdrawals.

Under the method of accounting and reporting of income used by petitioner, the individual subscription price of petitioner's service was posted to a deferred income account when received. Then, at the end of each month during which the service was rendered, an amount of deferred income equal to the direct cost of the service for that month, plus a portion of the balance of the deferred income account, was taken into income by a debit to the deferred income and a credit to regular income. The portion of the balance in the deferred income account which was taken into income, was the ratable portion determined by the number of months remaining in the new-car year.

This system of accounting was devised for petitioner's business by a certified public accountant prior to the formation of the petitioner corporation, and was consistently used in maintaining petitioner's books and records from the time of its incorporation to the date of sale of its business. The system was devised and instituted because substantially all of petitioner's annual subscription income was received during the last 3 months of the fiscal year but its contingent liability to furnish supplements to subscribers extended beyond the close of the year. Direct costs of providing petitioner's service were also greatest during this 3-month period at the end of the fiscal year.

The respondent in his deficiency determination increased taxable income for each year before us by including prepaid subscription income, deferred by taxpayer, as follows:

| Fiscal period | Taxable income reported | Additional income |
|---|---|---|
| Sept. 6 to Nov. 30, 1957 | $24,383.90 | $137,102.15 |
| Fiscal year ended Nov. 30, 1958 | 73,177.82 | 4,084.83 |
| Fiscal year ended Nov. 30, 1959 | 73,190.27 | 10,141.42 |

In his explanation of the adjustments for the three fiscal periods, respondent stated as follows:

It has been determined that the method of accounting adopted by your corporation is not permitted by section 455 of the Internal Revenue Code of 1954, and that it does not correctly reflect the income earned in any of the taxable years involved. Payments received are, therefore, held, under section 451 of the Code, to be income in the year received.

Prior to the present controversy, petitioner's status as the publisher of a periodical was considered by the State Board of Equalization of the State of California in connection with qualifications relative to the California sales tax. It was held by said board that the supplemental inserts published by the petitioner came within section 6362 of the Revenue and Taxation Code of the State of California, which provides that publishers of newspapers or periodicals are exempt from the sales and use tax imposed by said State. The initial looseleaf binder was held to be subject to such tax. There has been no change in the method of issuing supplemental inserts since receipt of this ruling. In each succeeding year, sales tax reports have been prepared for petitioner by its accountant in reliance upon this exemption. These reports have been examined by the State Board of Equalization of the State of California through the year ending December 31, 1961, and have been accepted as filed.

FINDING OF ULTIMATE FACT

Petitioner's automotive information service was not a periodical.

OPINION

Petitioner received most of its sales orders (and accrual basis revenue) in the last 3 months of its fiscal year. At the end of the short period ended November 30, 1957, and at the end of each fiscal year thereafter, petitioner "deferred" to the succeeding period a substantial portion of the income actually received in these respective periods. Thus, taxable income for each period did not include income which had been received (or accrued) during the period but deferred to the

following period. The deficiencies in the instant case result solely from reallocation by respondent of deferred income out of the period to which it was deferred and back into the period in which it was received or accrued.

Section 451 of the 1954 Code provides that the amount of an item of gross income "shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period." There is no dispute here that the amounts deferred were gross income in the period received (or accrued, under petitioner's accrual basis accounting system). However, petitioner contends that under its method of accounting the amounts deferred are "properly accounted for as of a different period."

Respondent relies on section 446(b) which permits him to compute taxable income under a method which clearly reflects income if the taxpayer's method does not clearly do so. Respondent asserts that petitioner's deferral method does not clearly reflect income for Federal income tax purposes, relying on *American Automobile Association* v. *United States*, 367 U.S. 687 (1961), rehearing denied 368 U.S. 870 (1961) (hereinafter sometimes referred to as the *A.A.A.* case), and other cases reciting the well-established principle that income received under claim of right may not be deferred.

Except for the question, discussed *infra*, of the applicability of section 455, this case is a typical example of the many which dramatize the distinction between generally accepted accounting treatment and prescribed tax treatment for income recognition.

Congress previously provided for the deferral of prepaid income where amounts were received in connection with an obligation to render services or furnish goods which extended beyond the close of the taxable year in which such amounts were received. Under section 452 of the 1954 Code, the deferral system used by petitioner would have been acceptable for the computation of Federal income tax liability. However, in 1955 section 452 was retroactively repealed, and the law as it existed prior to the enactment of section 452, prohibiting deferral of income, came back into effect. Pub. L. No. 74, 84th Cong., 1st Sess., sec. 1(a), 69 Stat. 134.

The Supreme Court in *American Automobile Association* v. *United States*, *supra*, reaffirmed the current effectiveness of the pre-section 452 law prohibiting deferral. The Court construed the enactment and repeal of section 452 as indicating a legislative intent that no deferral of prepayments should be allowed unless specifically authorized. The Court's position was still further reinforced in *Schlude* v. *Commissioner*, 372 U.S. 128 (1963), affirming 296 F. 2d 721 (C.A. 8,

1962) and 32 T.C. 1271 (1959), in which deferral of income was not permitted even when the contracts giving rise to accrual basis income provided for deferred payments of cash by the customer. The non-deferral rule of the *A.A.A.* case is applicable to situations involving goods and services alike. *Chester Farrara*, 44 T.C. 189 (1965). Unless petitioner can show that its method of income accounting and reporting is permitted under one of the statutory exceptions to the general rule prohibiting deferral, it, as many who have gone before, must "defer" to that general rule.

There are presently two statutory exceptions to the general rule. Section 455 permits deferral of prepaid subscription income, and section 456 permits deferral of prepaid dues income of certain membership organizations which are obligated to render future services to their members. Petitioner's principal contention in this case is that the income which it deferred was prepaid subscription income within the meaning of section 455 [6] and that this income was therefore properly deferrable under the 1954 Code.

Section 455 applies only to income "from a subscription to a newspaper, magazine, or other periodical." Petitioner does not argue that its automotive information service was a newspaper or magazine but contends that it qualified as a "periodical" within the meaning of section 455(d). Petitioner claims that its service was a periodical because it periodically published written material which it sent to prepaid "subscribers" by mail and such mailing took place throughout the new-car year covered by the subscription. We do not think that this description necessarily qualifies the service as a periodical within the contemplation of section 455.

The phrase "other periodical," used in section 455 is not defined in the section nor anywhere in its statutory history. In such circumstances the language of the section renders this a proper case for application of the rule of *ejusdem generis*. Thus, the meaning of the phrase "other periodical" would be restricted to publications similar in character to newspapers and magazines. Petitioner's service was in no sense a newspaper or magazine, and we conclude it was not similar in character to a newspaper or magazine.

---

[6] SEC. 455.  PREPAID SUBSCRIPTION INCOME.

(a) YEAR IN WHICH INCLUDED.—Prepaid subscription income to which this section applies shall be included in gross income for the taxable years during which the liability described in subsection (d)(2) exists.

 \*        \*        \*        \*        \*        \*        \*

(d) DEFINITIONS.—For purposes of this section—

(1) PREPAID SUBSCRIPTION INCOME.—The term "prepaid subscription income" means any amount (includible in gross income) which is received in connection with, and is directly attributable to, a liability which extends beyond the close of the taxable year in which such amount is received, and which is income from a subscription to a newspaper, magazine, or other periodical.

(2) LIABILITY.—The term "liability" means a liability to furnish or deliver a newspaper, magazine, or other periodical.

Even if we do not resort to reliance upon *ejusdem generis*, petitioner has not convinced us that its service was a periodical within the contemplation of section 455. In the absence of legislative history indicating a contrary intention the assumption is that in employing the noun "periodical" Congress intended it to carry its ordinary meaning in everyday use. *Avery* v. *Commissioner*, 292 U.S. 210 (1934). See also *Gordon S. Dole*, 43 T.C. 697, 707 (1965) (Judge Raum concurring), affirmed per curiam 351 F. 2d 308 (C.A. 1, 1965). In ordinary use the word implies a written publication appearing at stated or fixed regular intervals.[7] Although no attempt to define the word may be found in the legislative history, the following excerpt from the report of the Senate Committee on Finance accompanying the Technical Amendments Act of 1958, which gave birth to section 455, S. Rept. No. 1983, 85th Cong., 2d Sess., p. 42 (1958), 1958–3 C.B. 922, 963, indicates a frame of reference which contemplates the element of fixed regular intervals as inherent in the term "periodical":

> Publishers of newspapers, magazines and other periodicals *customarily* make significant portions of their sales on a subscription basis; that is, *the purchaser pays for a series of periodicals* in advance and the publisher undertakes the responsibility of supplying the periodical at *stated periods of time.* * * * [Emphasis supplied.]

In the instant case the petitioner's supplements were put out at irregular intervals, and their very *raison d'être* was determined by contingencies entirely beyond the control of either petitioner or its customers. Extraneous contingencies determined the number and frequency of supplements, and it was possible that if no price changes occurred throughout a new-car year, not a single supplement would have to be mailed. The emphasized portion of the above-quoted excerpt from the committee report brings home the distinction between petitioner's business and the type which section 455 was intended to cover. In the situation contemplated by the committee "the purchaser pays for a series of periodicals"; in the instant case the purchaser is *not* paying for a series of periodicals—the number of supplements he will receive is unknown and could possibly be zero—he is *paying for the basic looseleaf manual* plus the "servicing" thereof if servicing is needed.

Not only has petitioner failed to point out any legislative history behind the statute here involved which would justify our straining the word "periodical" beyond its commonly accepted meaning, and the meaning ascribed under the rule of *ejusdem generis* previously men-

---

[7] This usage and interpretation is supported by at least three dictionaries—Webster's New Collegiate Dictionary (1960 ed.), Webster's New International Dictionary (1934 and 1944 eds.), Winston Dictionary (1944 ed.).

tioned, but our search of the relevant history [8] tends to indicate that the type of business operated by petitioner was not of the sort Congress was attempting to aid in enacting section 455.

Petitioner urges us to give careful consideration to the fact that for State sales tax purposes the Board of Equalization of the State of California has determined to treat its automotive information service as a "periodical." It argues that California's conclusion about this is "uniquely helpful" here. We have carefully considered this argument and do not find it as helpful here as petitioner indicates. The fact that such an agency of a State has determined that petitioner's service was a "periodical" within the meaning of a California sales tax statute is of little weight in determining whether the service was a periodical within the limited meaning of that term in section 455 of the Internal Revenue Code.

The situation disclosed by the record here is in essence the same as in the *A.A.A.* case; there the taxpayer sold memberships, had a continuing liability in connection therewith, and discharged that liability by rendering services intermittently throughout the year. The facts before us are similar in all material respects to those of *Streight Radio and Television, Inc.*, 280 F. 2d 883 (C.A. 7, 1960), affirming 33 T.C. 127 (1959), in which the taxpayer sold television sets with a service warranty under which it was liable to supply repair service as required during the year following the sale. In that case the taxpayer was not permitted to defer any portion of its sales income nor accrue estimated expense of future servicing. See also *L. L. Crosby*, 35 T.C. 739 (1961).

The only distinction between these and other service contract cases and the instant case is that here the servicing of the product sold (the looseleaf manual) was performed by the mailing of printed material, whereas in the other cases the service was performed in person. This factual distinction is legally meaningless, yet petitioner would have us recognize the distinction by regarding what is in essence a service as a periodical merely because the service is performed by the mailing of written material. This we cannot do.

This case presents another example of the difficulty inherent in determining when receipts are to be recognized as income for Federal income tax purposes. It emphasizes the divergence between prescribed tax treatment and generally accepted accounting principles. Yet, the distinction is now beyond serious challenge, and further granting of the deferral privilege to limited groups other than those specified

---

[8] S. Rept. No. 1983, 85th Cong., 2d Sess., p. 42, 1958–3 C.B. 922, 963 ; 104 Cong. Rec. 17058 (1958) ; S. Rept. No. 372, 84th Cong., 1st Sess., p. 5 ; Hearings Before the Committee on Ways and Means, 84th Cong., 1st Sess. 176–187, 286 ; Hearings Before the Committee on Finance, 84th Cong., 1st Sess. 29–38, 101–106.

by Congress in sections 455 and 456 of the Code must await further congressional action. *Schlude* v. *Commissioner, supra.*

The repeal of section 452, and the subsequent *A.A.A.* and *Schlude* cases, clearly establish the general rule that prepaid income may not be deferred. Congress has permitted only two exceptions to this general rule. As an exception to the general rule, section 455 must be strictly construed, and we must decline to distinguish this case from the many which have fallen victim to the general rule and are essentially indistinguishable in principle, without a clear showing that petitioner's service was a periodical within the intendment of section 455.

Since we have concluded that the service sold by petitioner was not a periodical within the meaning of section 455, we must uphold the respondent's determination. Petitioner had unrestricted use of the funds paid in by its subscribers and it has not demonstrated that its method of accounting for and reporting income clearly reflected that income for Federal income tax purposes. The Commissioner's disapproval of petitioner's system of deferring income was a proper exercise of his statutory discretion. *Chester Farrara, supra.*

Because of respondent's concession as to the reduction of petitioner's income for the fiscal period ended November 30, 1957, and to provide for any other adjustments required by our conclusions,

*Decision will be entered under Rule 50.*