GORDON S. DOLE AND ELIZABETH D. DOLE, ET. AL., [1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1687–63—1690–63. Filed February 19, 1965.

---

[1] Proceedings of the following petitioners are consolidated herewith: George M. Fitzpatrick and Mildred L. Fitzpatrick, docket No. 1688–63; Mildred L. Fitzpatrick, docket No. 1689–63; and Joseph M. Morse and Barbara M. Morse, docket No. 1690–63.

*Raymond T. Mahon,* for the petitioners.
*Sanford M. Kirshenbaum,* for the respondent.

DAWSON, *Judge:* [2] Respondent determined the following deficiencies against the petitioners:

| Petitioners | Docket No. | Year | Deficiency |
|---|---|---|---|
| Gordon S. and Elizabeth D. Dole | 1687–63 | 1958 | $539.24 |
| | | 1959 | 596.88 |
| | | 1960 | 578.47 |
| George M. and Mildred L. Fitzpatrick | 1688–63 | 1960 | 870.08 |
| Mildred L. Fitzpatrick | 1689–63 | 1958 | 1,236.67 |
| | | 1959 | 1,234.58 |
| Joseph M. and Barbara M. Morse | 1690–63 | 1958 | 2,701.24 |
| | | 1959 | 2,709.57 |
| | | 1960 | 2,693.37 |

The issues for decision are:

(1) Whether petitioners are entitled to exclude from their gross incomes during the taxable years 1958 through 1960 the fair rental value and cost of utilities of company-owned houses furnished to them by their employer, Packard Mills, Inc.

(2) Alternatively, and to be decided only if the fair rental value of such lodging is determined to be includable in petitioners' gross income, whether the fair rental value and cost of utilities of the houses are in the amounts as determined by the respondent or in some lesser amounts.

(3) Whether petitioner Joseph M. Morse received additional income in the taxable years 1958 through 1960 because of his use of a company-owned automobile.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly.

---

[2] This case was heard by Judge Clarence V. Opper and briefs were duly filed. Judge Opper died on June 19, 1964. This case, not having been disposed of, was reassigned to Judge Howard A. Dawson, Jr., on Nov. 5, 1964, and notice was given to the parties that any request for rehearing or reargument might be presented to him within 30 days. No such requests have been received.

Gordon S. and Elizabeth D. Dole are husband and wife who reside at 821 School Street, Webster, Mass. They filed their joint Federal income tax returns for the taxable years 1958, 1959, and 1960 with the district director of internal revenue, Boston, Mass.

George M. and Mildred L. Fitzpatrick are husband and wife who reside at 768 School Street, Webster, Mass. They filed their joint Federal income tax return for the taxable year 1960 with the district director of internal revenue at Boston, Mass. Mildred L. Fitzpatrick also filed her individual income tax returns for the years 1958 and 1959 with the district director of internal revenue at Boston.

Joseph M. and Barbara M. Morse are husband and wife who reside at 835 School Street, Webster, Mass. They filed their joint Federal income tax returns for the years 1958, 1959, and 1960 with the district director of internal revenue at Boston, Mass.

Joseph M. Morse, Gordon S. Dole, and Mildred L. Fitzpatrick will sometimes be referred to collectively as petitioners.

Packard Mills, Inc., is a corporation located in Webster, Mass., and is engaged in the business of manufacturing woolen cloth. It is a so-called vertical mill, i.e., a complete unit within itself whereby raw materials are taken in and put through the blending, spinning, weaving, dyeing, and finishing processes before coming out as a finished product for shipment to coat manufacturers.

The majority stock interest in Packard Mills, Inc., is owned by Ralph K. Hubbard and his family. Ralph K. Hubbard is president and treasurer of Packard Mills, having held the position of treasurer from 1921 to date, and having held the position of president from 1929 to 1956 and from 1961 to the present time.

During the taxable years 1958 through 1960, Packard Mills owned five residences on School Street in Webster, Mass. These residences are all located approximately 1 mile from the mill. One of these residences is located at 835 School Street and was occupied by Joseph M. Morse and his family during the years in issue. Another of these residences is located at 821 School Street and was occupied by Gordon S. Dole and his family during these years. Another residence is located at 768 School Street and was occupied by Mildred Fitzpatrick and her family during these years. The fourth residence is used as a guesthouse by Packard Mills, and the fifth is rented to someone unconnected with Packard Mills.

All of the company-owned houses on School Street and the residence occupied by Ralph K. Hubbard are located within 100 yards of each other. The residences at 821 School Street and 835 School Street, together with the so-called guesthouse, were acquired by Packard Mills in the early 1940's. The company-owned house at 768 School Street was acquired by Packard Mills in 1955.

Since the early 1940's, the management of Packard Mills has made it a policy to require its key personnel to live in close proximity to the mill, primarily to promote its efficient operation. To this end, the mill management made it a practice to furnish decent living quarters to its key employees as near to the mill as possible.

Packard Mills bought the houses occupied by the petitioners rather than build houses at the millsite because the mill yard is not a desirable place to live.

When Packard Mills acquired the houses occupied by petitioners there was no desirable residential property located any closer to the mill than these houses.

Joseph M. Morse started to work for Packard Mills in 1938. In 1942 he became assistant superintendent and in 1946 he became superintendent. During the years 1958 through 1960 Morse was the only superintendent of the mill and he had only one assistant superintendent working with him, namely Gordon S. Dole, who was first employed as assistant superintendent in 1954.

During the taxable years in issue Morse and Dole were solely in charge of supervising the 350 production personnel employed at Packard Mills. The mill operated on a 24-hour-per-day basis, Monday through Friday, and it generally operated two shifts on Saturday. For a mill its size the usual number of supervisory personnel in charge of production work would be three or four persons, including a night superintendent. However, Packard Mills had no night superintendent because Morse and Dole handled these responsibilities.

When Morse became assistant superintendent of Packard Mills in 1942, he was told by Ralph K. Hubbard that he would be on call 24 hours per day and that he would have to live in a company-owned house to be in close proximity to the mill for better supervisory efficiency, to be available in the case of emergency breakdowns at the mill, and to be on hand for conferences. At that time Morse moved into the company-owned house at 821 School Street and he continued to reside there when he became superintendent of the mill in 1946. He later moved out of the company-owned house at 821 School Street and moved into the house at 835 School Street, where he resided during the years 1958 through 1960.

When Dole became assistant superintendent of the mill in 1954, he was told by Ralph K. Hubbard that he would be on call 24 hours per day and that he would have to live in a company-owned house close to the mill so that he would be readily available for emergencies and conferences.

Morse's usual working day at the mill was 10 to 12 hours, starting at about 6 a.m. and continuing to 5 p.m. Morse also worked at the mill on some Saturdays, Sundays, and holidays and often returned

to work at the mill in the evenings. Morse found that his job at the mill required him to live close to it because of the necessity for handling emergencies that arose while he was at home. He also found it necessary to check at the mill at odd hours during the night to make sure that the routine of the mill was functioning properly.

The emergencies at the mill which required the presence of Morse included labor difficulties as well as breakdowns in machinery. Breakdowns in machinery necessitated supervisory decisions by Morse as to whether the work in process should be rerouted around the breakdown or should await the repair of the broken machine. At Packard Mills each process in the manufacture of the cloth depends upon the process ahead and, if a breakdown occurs in a department, it could hold up the work in all subsequent departments.

Dole worked with Morse at the mill during these emergencies, and the management or supervisory decisions with respect to the corrective action to be taken in case of such emergencies were left up to Morse and Dole.

Emergencies requiring the corrective action of Morse and Dole often occurred in the evenings, or at night after the two men had left the mill for the day. Consequently, they had to return to the mill on short notice. At times Morse was called back to the mill as often as three or four times per week to handle an emergency.

Dole's usual working day at the mill was from 6:45 a.m. to 5 p.m. and he also worked there on Saturday mornings and on some Sundays as well. In addition, Dole returned to work at the mill two or three evenings per week.

During the years in issue Dole's duties at Packard Mills involved production control and scheduling the flow of material through the mill. Dole found that his job at the mill required him to live in close proximity thereto so that he could be readily available for emergencies at the mill, assist in making the decision to take necessary corrective action, and follow through to see that the corrective measures were carried out.

Both Morse and Dole were called back to the mill in the evenings after they had left it for the day as often as two or three times per month to confer with other management personnel regarding mill business.

Dole was in the habit of stopping in at the mill two or three times per month during the evening or on Saturday afternoon either for the purpose of walking through a few departments to let the workers know that someone was looking out for the mill business or for the purpose of checking to see that routine orders were being carried out.

During the years 1958 through 1960 Morse owned a house in Woodstock, Conn., which is about 9 miles, or 25 minutes' driving time, from Packard Mills.

Neither Morse nor any member of his family has ever owned any stock in Packard Mills.

·In addition to the value of the lodging at 821 School Street, Dole also received a salary of $7,480.04 in 1958 and increases of $600 in 1959 and $300 in 1960. Salaries of Morse ($39,233.75) and Mildred Fitzpatrick ($10,800) remained the same throughout the years 1958 through 1960.

During the years in issue Mildred L. Fitzpatrick was the office manager of Packard Mills and confidential secretary to Ralph K. Hubbard, its treasurer. In addition, she handled the payroll, did all the accounting, and kept the books and records for Packard Mills plants in Webster and in Caryville, Mass. Her usual working day at the mill was from 7:30 a.m. to 5:30 p.m. As part of her work, Mildred Fitzpatrick was called upon to interpret the books and to supply information from them to her employer. At times the request for this information would come when she was off duty, and she would have to return to the mill to obtain the desired information. Such requests for information during off-duty hours were made about twice a month.

Whenever a payroll dispute occurred in the case of a man on the third shift who would be going off duty at midnight, Mildred Fitzpatrick would be called down to the mill around 11 p.m. to resolve the dispute. At times these payroll disputes which required the presence of Mildred Fitzpatrick at the mill occurred as frequently as three times per month.

Mildred Fitzpatrick was first employed by Packard Mills in 1951, at which time she was living in Worcester, Mass. Later she acquired a house in Charlton, Mass., which she moved into in 1953. This home in Charlton was 11 miles, or about a 25-minute drive by automobile, from Packard Mills.

In 1955 Ralph K. Hubbard told Mildred Fitzpatrick that she would have to move into a company-owned house in order to be more available for work and in order to be nearer at hand when he needed her. She then moved into the company-owned house at 768 School Street, but continued to own her own home in Charlton. This house remained vacant until 1959 when it was sold. Her Charlton home was never rented, nor did she allow anyone to use it. Instead she used it herself on weekends whenever possible.

The management of Packard Mills thought that Mildred Fitzpatrick should move into one of the company-owned houses on School Street so that they could more freely ask her to come to the mill to render assistance at times when she was away from the mill.

Neither Mildred Fitzpatrick nor any member of her family has ever owned stock in Packard Mills.

The primary reason why petitioners Morse, Dole, and Fitzpatrick were permitted to live rent-free in the company-owned houses located on School Street was to promote the efficient operation of Packard Mills.

Webster, Mass., is a mill town. Its population (about 13,500) has remained the same since 1900. It is not a growth area and most of the town is quite rural. The nearest large city is Worcester, approximately 20 miles away.

The premises at 821 School Street, occupied by Dole, is a seven-room wooden frame dwelling, two and one-half stories high, with oil-fired hot water heat. It is located on a lot 100 feet by 120 feet and is about 60 years old.

The premises at 835 School Street, occupied by Morse, is an 11-room frame dwelling with oil-fired steam heat. It is located on a lot running 240 feet on School Street and about 150 feet deep. It is approximately 40 years old.

The premises at 768 School Street, occupied by Mildred Fitzpatrick, is an eight-room brick house with oil-fired hot water heat. It is located on a lot 125 feet by 105 feet and is about 60 years old.

The area immediately around Packard Mills is low brushland on either side of the mill. The French River runs behind the mill itself. Aside from a company-owned house directly across the street from the mill, the nearest dwellings to the mill are located in a small village about one-half mile away. None of the homes in the village are available for rent. There is no residential property available for rent in the immediate area of Packard Mills, nor is there any comparable and suitable residential property available for rent located any nearer to the mill than the company-owned houses on School Street. However, there are comparable, suitable, and desirable residential homes, which are available for rent and for sale, located within 2 to 3 miles of the millsite, particularly in the Thompson Road area and the East Main Street area.

No company activities were carried on in the company-owned houses furnished to the petitioners.

Comparable houses in the Thompson Road area and the East Main Street area, as well as one located adjacent to the company-owned house occupied by Mildred Fitzpatrick, rented for $100 to $125 per month, not including the cost of heat and hot water.

The fair rental value of the property located at 821 School Street, occupied by Dole, during each of the years 1958 through 1960 was $125 per month, including the cost of heat, hot water, and utilities.

The fair rental value of the property located at 835 School Street, occupied by Morse, during the years 1958 through 1960 was $150 per month, including the cost of heat, hot water, and utilities.

The fair rental value of the property located at 768 School Street, occupied by Mildred Fitzpatrick, during the years 1958 through 1960 was $125 per month, including the cost of heat, hot water, and utilities.

In his notices of deficiencies, respondent determined that the rental values, including utilities, of the company-owned houses occupied by petitioners constituted compensation for services includable in their taxable income in the following amounts for the years involved:

| Petitioner | 1958 | 1959 | 1960 |
|---|---|---|---|
| Gordon Dole | $2,703.10 | $2,753.00 | $2,791.24 |
| Joseph Morse | 3,843.37 | 3,904.94 | 3,913.73 |
| Mildred Fitzpatrick | 3,072.18 | 3,280.03 | 3,313.15 |

During the years 1958 through 1960 Morse owned a 1956 Pontiac automobile. He also had the use of a 1957 Cadillac automobile which was owned by Packard Mills. The company-owned Cadillac was driven between 12,000 and 14,000 miles per year by Morse. The purposes for which the Cadillac was used included trips between the mill and Morse's home several times each day, trips to New York City where the sales agents for Packard Mills are located, trips to meetings held by the National Association of Woolen Manufacturers, trips to textile machinery companies to look at machinery, trips to the Caryville mill operated by Packard Mills, and trips to various business meetings that had to do with mill business. The Cadillac was also used for trips to church, short vacation trips, and other personal business conducted in the evening. The Pontiac was used for shopping trips and taking the children to school and for other personal uses only.

#### ULTIMATE FINDINGS

1. The company-owned houses were furnished to petitioners because of their employment with Packard Mills, and were not furnished gratuitously.

2. Occupancy of the company-owned houses was not necessary for the proper performance of petitioners' duties of employment.

3. The values of the lodging, including utilities, furnished to petitioners by Packard Mills were as follows:

| Petitioner | 1958 | 1959 | 1960 |
|---|---|---|---|
| Gordon Dole | $1,500 | $1,500 | $1,500 |
| Joseph Morse | 1,800 | 1,800 | 1,800 |
| Mildred Fitzpatrick | 1,500 | 1,500 | 1,500 |

4. Petitioner Morse used the company-owned Cadillac 50 percent of the time on the company business of Packard Mills and 50 percent of the time on his own personal business.

OPINION

Gross income, as defined in section 61(a), I.R.C. 1954, means all income from whatever source derived, including, but of course not limited to, compensation for services. Thus it includes income realized in any form, i.e., money, property, or services. It is clear from the testimony of petitioners and their employer that the company-owned houses were furnished to petitioners because of their employment relationship with Packard Mills. Consequently, the value of such lodging is includable in their gross income for the years here involved unless specifically excludable under another provision of the Internal Revenue Code. See *Commissioner* v. *Duberstein*, 363 U.S. 278 (1960); and *Commissioner* v. *LoBue*, 351 U.S. 243 (1956).

Petitioners maintain that the value of the lodging they received from their employer, Packard Mills, during the years 1958, 1959, and 1960 is excludable from their gross incomes under the provisions of section 119 of the Internal Revenue Code of 1954.[3]

In order to qualify for the exclusion of section 119, three conditions must be met: (1) The employee must be required to accept the lodging as a condition of his employment; (2) the lodging must be furnished for the convenience of the employer; and (3) the lodging must be on the business premises of the employer. Sec. 1.119-1(b), Income Tax Regs.

While it is the respondent's position that petitioners have failed to meet all three conditions of the statute, the failure of petitioners to meet any one of them will cause the value of the lodging to be includable in their gross income. *William I. Olkjer*, 32 T.C. 464 (1959).

We need to go no farther than the first requirement of the statute to decide, on the facts of these proceedings, that the petitioners were *not* required to accept the lodging provided by their employer in order to enable them to perform properly the duties of their employment. Merely because Ralph K. Hubbard, the president of Packard Mills, insisted that petitioners occupy the company-owned houses to help

[3] SEC. 119. MEALS OR LODGING FURNISHED FOR THE CONVENIENCE OF THE EMPLOYER.

There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him by his employer for the convenience of the employer, but only if—

\*     \*     \*     \*     \*     \*     \*

(2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment.

promote the efficient operation of the mill does not, standing alone, mean that the statutory standard—required to accept such lodging as a condition of employment—is met. The standard prescribed by Congress is not subjective. It is objective. The employer's state of mind is not controlling. This is made certain by the legislative history [4] of section 119. And this objective standard is likewise embodied in section 1.119–1(b), Income Tax Regs. Many employers may prefer that their employees live near the worksite so that they will be more readily available for work. Cf. *Mary B. Heyward*, 36 T.C. 739 (1961), affd. 301 F. 2d 307 (C.A. 4, 1962). This is not a situation like *William I. Olkjer, supra*, and *George I. Stone*, 32 T.C. 1021 (1959), where company housing near the construction site was the *only housing* available in which the employees could live. By contrast, it was not necessary for these petitioners to live in the company-owned houses to perform their duties adequately. No company business was conducted in the homes. They were used only as the private residences of petitioners. Cf. *U.S. Junior Chamber of Commerce* v. *United States*, 334 F. 2d 660 (Ct. Cl. 1964). Granted that petitioners needed to be in close proximity to the mill when emergencies occurred, they could have lived in other available and suitable houses located within the town of Webster and within a radius of 3 miles from the mill. In our opinion the additional traveling time involved would not have hindered them in the proper performance of their respective duties. There is no question, in our judgment, that the occupancy of these company-owned houses has bestowed on petitioners a "fringe" benefit, the value of which must be included in their gross income for tax purposes. To conclude otherwise from the facts and surrounding circumstances disclosed by this record would strip this statutory condition of any effective meaning or scope.

There is still another, and equally compelling, reason for holding that petitioners have failed to bring themselves within the purview of section 119. These company-owned houses were not located "on the

---

[4] S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 190 (1954), reads as follows:

"This section corresponds to section 119 of the bill as passed by the House. Existing law, as currently interpreted by the Internal Revenue Service and certain court decisions, requires that if meals or lodging represent compensation the value thereof must be included in gross income even though the employee must accept such meals or lodging in order properly to perform his duties. Under section 119 of the bill as passed by the House if meals or lodging are (1) furnished at the place of employment, and (2) are required to be accepted by the employee at the place of employment as a condition of the employment, the value thereof is excludable from the employee's gross income. Under section 119 as amended by your committee, there is excluded from the gross income of an employee the value of meals or lodging furnished to him for the convenience of his employer whether or not such meals or lodging are furnished as compensation. In the case of meals the exclusion is permitted only if the meals are furnished on the business premises of the employer. In the case of lodging the exclusion is permitted only if the employee is required to accept the lodging on the business premises of the employer as a condition of his employment. The phrase 'required as a condition of his employment' means required in order for the employee to properly perform the duties of his employment."

business premises" of Packard Mills. Congress has plainly stated that the phrase "on the business premises" *generally* means at the place of employment. See H. Rept. No. 1337, pp. 18, A39; S. Rept. No. 1622, pp. 19, 190; and Conference Rept. No. 2543, pp. 26–27; to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. (1954). We think the phrase should be construed to mean either (1) living quarters that constitute an integral part of the business property or (2) premises on which the company carries on some of its business activities. We doubt whether Congress ever intended section 119 to apply to situations such as this, where the employee does his work in one location and resides at another location some distance away. Whatever may be said of the factual conclusion reached in *Charles N. Anderson*, 42 T.C. 410 (1964), on appeal (C.A. 6), that the residence of the motel manager, being within "two short blocks" of the motel, was sufficiently integrated with the motel property as to be "on the business premises," the facts here do not permit any such ultimate conclusion.

The amounts determined by respondent to be the rental values of the houses, including the cost of heat, hot water, and utilities, were excessive. Based on the expert testimony offered by petitioners, we are satisfied that the fair rental values of such lodging were not more than the amounts set forth in our ultimate findings of fact, and we so hold.

The issue as to Morse's use of the company-owned Cadillac is purely factual. Respondent determined the fair rental value of the automobile to be $1,650 for each of the years 1958, 1959, and 1960, and also determined that the automobile was used 20 percent of the time on company business and 80 percent of the time on Morse's personal business. We are satisfied, as set forth in our ultimate finding of fact, that such automobile was used 50 percent of the time on company business. No evidence was offered by Morse to show that the rental value of the automobile, including business and personal use, was less than the $1,650 per year determined by respondent.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

Drennen, *J.*, concurs in the result.

———

Raum, *J.*, concurring: Regardless of whether the claimed exclusion from gross income may be denied on this record for the first reason discussed in the majority opinion, it is clear to me that no such exclusion is available since the houses were not "on the business premises" of the employer, as required by section 119.

The furnishing of tax-free food and lodging to corporate officers or other employees was susceptible of abuse, and the tests applied to

determine the tax-free character of the food or lodging were unsatisfactory; accordingly, section 119 was enacted in the 1954 Code to spell out with particularity the restrictive conditions under which such exceptional tax treatment would be permitted. One of those conditions is that the lodging must be "on the business premises" of the employer. The statute does not say "at some convenient or reasonably accessible" place; it does not say "in any nearby building" owned by the employer. It says "on the business premises" of the employer. These words mean what they say and should not be given any strained or eccentric interpretation so as to frustrate what the Legislature obviously tried to achieve.

The attempt to justify such interpretation in one of the concurring opinions by seeking out a pivotal distinction between the words "on the business premises" and "at the place of employment" has no convincing support in the legislative history. The term "at the place of employment" which was in the original bill passed by the House was replaced with "on the business premises of the employer" by the Senate Finance Committee without any clarifying comment in this respect. S. Rept. No. 1622, *supra* at 19, 190. A reading of the Senate Finance Committee's report discloses nothing to suggest that the substituted words were regarded as having any significantly different meaning or that they represented anything other than a draftsman's preference in language. This is confirmed by the Conference Committee's statement, H. Rept. No. 2543, *supra* at 27, that "The term 'business premises of the employer' is intended, in general, to have the same effect as the term 'place of employment' in the House bill." Nothing in the history of these provisions even intimates that the term "on the business premises of the employer" was meant to have so much more elastic content than "at the place of employment" as to embrace a house 1 mile away. To the contrary, the examples given in the report of the Conference Committee are those of lodging furnished to a domestic servant in the employer's home or meals furnished to a cowhand herding his employer's cattle on leased lands or lands similarly used under permit.

It may be true, as urged in the dissenting opinion, that petitioners' employer had a legitimate business purpose in owning the houses, but it is specious to suggest that the occupancy of the houses in these circumstances itself constituted the conduct of the employer's business so that they themselves might qualify as "business premises." No business of the employer was conducted at these houses. To construe the statute otherwise would be to dispense entirely with the requirement in section 119 that the lodging be furnished "on the business premises of the employer"; for one could argue with equal persuasiveness in every case that the house is on the business premises where the

other conditions of the statute are satisfied, namely, where the lodging is furnished for the convenience of the employer and is required as a condition of employment. If compliance with these latter two requirements is sufficient to justify characterizing the house itself as "business premises" and thus to make the exemption applicable, the third condition, as to "business premises," would become wholly meaningless. I cannot believe that Congress intended any such futile result, and it seems clear that the condition relating to "business premises" was meant to have independent operative scope. It is also plain to me that Congress used that term in the normal sense as referring to the actual conduct of the employer's business and not in some esoteric sense relating to the purpose for which the property was held.

The matter probably would never have reached this present state of apparent confusion and disagreement among the members of this Court were it not for the unreviewed decision in *Charles N. Anderson*, 42 T.C. 410. I think that *Anderson* is distinguishable for the reason articulated in the majority opinion. But I also think that it is wrong and that it should be overruled to put an end to the confusion that it has created.

The fact that the motel manager's house in *Anderson* was "only two short blocks" (42 T.C. at 415) from the motel property should have been totally irrelevant. The house either was or was not "on the business premises," and I can find no basis in the statute to stretch those premises "two short blocks," or "one short block," or even "one-half short block" beyond the perimeter of the motel property. Of course, if "two short blocks" are not fatal, it is easy to see how one might be tempted to enlarge the distance to the 1 mile involved herein, or, for that matter, 2 miles or 5 miles. The real difficulty is that neither the residence in *Anderson* nor any single residence involved herein is "on the business premises" of the employer. And in view of the mischief generated by *Anderson* I think it should be explicitly disapproved.

PIERCE and MULRONEY, *JJ.*, agree with this concurring opinion.

TIETJENS, *J.*, agrees with Judge Raum's concurring opinion except so far as it suggests that *Charles N. Anderson*, 42 T.C. 410, should be "explicitly disapproved."

SCOTT, *J.*, concurring: I agree with the majority that the phrase "required as a condition of his employment" as used in section 119 of the Internal Revenue Code of 1954 means "required in order for an employee to properly perform the duties of his employment." Whether a particular taxpayer is required to live in a specific dwelling to properly perform the duties of his employment is a question of fact. The primary facts found in the instant case are sufficient in my view to

support the ultimate fact that the petitioners were not required to accept the lodgings furnished to them as "a condition of" their "employment." I therefore concur in the result reached by the majority.

While it might follow from the fact that it was not necessary for the employer to furnish petitioners their lodgings in order for petitioners to properly perform the duties of their employment, that the houses furnished to petitioners were not property sufficiently connected with their employer's manufacturing operations to be "business premises" of the employer, I do not agree with the construction placed on the phrase "on the business premises" in the majority opinion. To construe that phrase to be limited to living quarters that constitute an integral part of the business property or premises on which the company carries on some of its business activities other than providing housing necessary for its employees properly to perform the duties of their employment equates "on the business premises" with "at the place of employment."

The House bill contained the phrase "at the place of employment" in describing the location of lodging, the value of which was excludable from gross income, but this wording was changed by the Senate to "on the business premises of the employer." The Committee of Conference adopted the language of the Senate report stating that the "term 'business premises of the employer' is intended in general to have the same effect as the term 'place of employment.'" See H. Rept. No. 1337, *supra* at 18, A39; S. Rept. No. 1622, *supra* at 19, 190; and Conference Rept. No. 2543, *supra* at 26–27.

This legislative history indicates that the phrases "on the business premises" and "at the place of employment" though generally creating the same criteria for the location of lodging, the value of which is excludable from gross income of an employee, are not synonymous. In my view the change made from the House bill was intended to have "on the business premises" apply not only to lodging "at the place of employment" but also to a lodging which is "business premises" of the employer because it is so vital to the operation of such employer's business that an employee live at a particular location that the employer supplies the dwelling at that location specifically for the purpose of having the employee live therein in order to enable the employee to properly perform the duties of his employment. Section 1.119–1(c), Income Tax Regs., provides: "For purposes of this section the term 'business premises of the employer' *generally* means the place of employment of the employer." (Emphasis added.) The use of the word "generally" in this provision of the regulations likewise indicates that "on the business premises of the employer" is not always "at the place of employment." See *Charles N. Anderson*, 42 T.C. 410, 416 (1964), on appeal (C.A. 6).

The term "on the business premises" as construed in the majority opinion would exclude from the application of section 119 lodging furnished to employees on certain types of construction projects such as highways where the place of employment changes from day to day. Cf. *William J. Olkjer*, 32 T.C. 464 (1959). That construction of the term "on the business premises" would likewise mean that if a public road divided the living facilities furnished to construction workers on a project such as a tunnel, those living on the side contiguous to the property on which the tunnel was being constructed would be permitted to exclude from their gross income the value of the lodging furnished while those across the road would not be permitted to do so. Cf. *George I. Stone*, 32 T.C. 1021 (1959). In my opinion Congress clarified the words of the statute by changing the phrase "at the place of employment" to "on the business premises" to avoid the narrow construction of section 119 which the majority opinion in this case places thereon.

ATKINS and FAY, *JJ.*, agree with this concurring opinion.

———

FAY, *J.*, concurring: Although I agree with the result reached by the majority, I find myself unable to completely agree with their reasoning. I do not have any difficulty with the majority's conclusion that the petitioners were not required to accept the lodging provided by their employer as a condition of their employment. This alone is sufficient for the issue involved to be decided against petitioners. I feel the opinion should have ended at this point. However, the majority does not stop here, but proceeds to find that the company houses were not located "on the business premises" of Packard Mills. It is with this finding that I cannot agree. I believe that the *Anderson* decision, discussed by the majority, reached the right result and that it is controlling here insofar as the question of business premises is concerned. The houses owned by Packard Mills and lived in by petitioners in the instant case are as much a part of the business premises as was the house in question in the *Anderson* case. As the distance between the living quarters and the actual place where the employee performs his duties becomes greater, it becomes more difficult to find that the living quarters were furnished as a convenience for the employer or that the employee was required to accept the lodging as a condition of his employment. However, the living quarters may still, nevertheless, be on the business premises of the employer, as is the case here.

FISHER, *J.*,* agrees with this concurring opinion.

*The report in this case was adopted by Court review during Judge Fisher's tenure of office

WITHEY, *J.*, dissenting: Section 119 of the 1954 Code permits the exclusion from taxable income of the rental value of lodging furnished the petitioners by their employer only in case such lodging was located on the business premises of the employer, and their living in such premises was required as a condition of their employment and was for the employer's convenience. The majority have denied the exclusion of such rental values here on two grounds: First, that the petitioners' occupancy of company-owned residences was not required by their employer as a condition of their employment and, secondly, that the residences do not comply with the statutory provision that they be located upon its "business premises." I am impelled to dissent on both grounds.

With respect to all three employees the findings as to the reason for their occupancy of company-owned residences were in part that their employer stated they would each "have to move into a company-owned house." There is no dispute that this was "for the convenience of the employer." To hold that it was not "required" by him as a condition of employment in view of the indicated finding is to me incredulous. The only reasonable conclusion I am able to draw from the finding is that the employees' refusal to occupy the residences would have resulted in their not being employed.

This statute was designed to exclude from taxable income what would otherwise constitute compensation for services rendered and be taxable as ordinary income under section 61(a) of the Code. A safeguard was there provided to assure that even though lodgings such as these were occupied by employees for their employer's convenience, the rental value thereof would escape taxation to the employees only if the lodgings constituted business premises of the employer. These residences were not located on the manufacturing premises of the company, but they nevertheless were clearly "business premises" in nature when that term is viewed in the light of all the provisions of section 119 in lieu of separately as has been done by the majority. That the residences were owned by the employer is clear. That the employer owned them for business purposes is also clear to me if it be conceded that management constitutes the conduct of business as surely as a manufacturing procedure. To manage the affairs of this employer it was necessary that petitioners forego their personal freedom from business affairs during the hours of each day subsequent to their normal working period. Their living in company-owned and designated dwellings so that they were available for work throughout each 24-hour period was part and parcel of the management of their employer and as such constituted the conduct of business.

In light of the fact that the word "premises" as used in the statute must under the usual rules of statutory construction be construed to apply universally to all businesses, it is difficult for me to believe that

Congress intended, without specifically saying so, to nevertheless limit the meaning of the word to a single integral compound or close.

To constitute compensation for services rendered, lodgings furnished by an employer must be occupied by an employee in the same manner as would be the case were they provided at his own expense in a location of his own choosing. Except of his own volition, he would not in the latter case be subject to call at any time during his off hours and such lodgings could be at any location he desired. Here, although two petitioners owned homes located in the same general area as the place of their employment, on pain of losing their employment, they had no choice of living either there or in the company-owned residences. They were, in a sense, carrying out the duties of their employment even during their off-duty hours. This they were doing at the insistence of their employer, for its convenience and as a condition (reasonable it seems to me) of continuing to be employed.

The exclusions in each docket should be permitted. See *Charles N. Anderson*, 42 T.C. 410 (1964), on appeal (C.A. 6), which in my view is correctly decided, is indistinguishable on its facts from those before us, and is controlling of this issue.

FORRESTER, *J*., agrees with this dissent.