Henry M. and Susan E. Lees v. Commissioner.
Lees v. Commissioner
Docket No. 5606-64.
United States Tax Court
T.C. Memo 1965-327; 1965 Tax Ct. Memo LEXIS 1; 24 T.C.M. (CCH) 1823; T.C.M. (RIA) 65327; December 30, 1965
*1 Held, $200 monthly cash housing allowance paid to petitioner by his employer in 1962 is includable in petitioner's gross income and is not deductible in arriving at petitioner's taxable income for that year. Henry M. Lees, pro se, 751-21st E., Metaline Falls, Wash. James A. Thomas, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in petitioners' income tax for the taxable year 1962 in the amount of $609.24. The issue for decision is whether $200a monthly cash allowance paid to Henry M. Lees by his employer in 1962 is includable in his taxable income for that year. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation of facts together with exhibits attached thereto are incorporated herein by this reference. Henry M. (hereinafter referred to as petitioner) and Susan E. Lees, husband and wife, filed their joint income tax return for the taxable year 1962 with the district director of internal revenue, Tacoma, Wash.
Petitioner lived in the Philadelphia, Pa., area until May 1944. Petitioner moved to the State of Washington in 1944 and was employed by Berry Engineering Co. at Bremerton, *2 Wash., as a laboratory technician and inspector from October 1944 until 1945. On December 10, 1945, petitioner commenced employment at the Department of Lighting of the City of Seattle, Wash. (hereinafter referred to as Seattle City Light), as an assistant concrete inspector on its Ross Dam construction project. Seattle City Light is a municipally owned public utility primarily serving the 127-squaremile Seattle metropolitan area. Since the 1920's, Seattle City Light has been intermittently constructing dams and powerplants on the Skagit River near Newhalem; Wash., which is located approximately 125 miles northeast of Seattle. Upon the commencement of his employment by Seattle City Light petitioner immediately moved to the Ross Dam site and resided there while his family continued to reside in Bremerton, Wash. In August 1947 petitioner's wife and family joined him at the Ross Dam site, living in a house furnished by the company. [1]
In March 1949 petitioner and his family moved to the town of Newhalem, 12 miles south of Ross Dam. Seattle City *3 Light was building another generating unit and petitioner was transferred to Newhalem and furnished a house there in order to be near his work. On July 1, 1957, while still residing in Newhalem petitioner purchased a house at 751 21st Street East, Seattle, Wash., and rented this house for $75 per month from July 1957 through June 1958. On July 2, 1958, petitioner was named resident engineer of the Skagit Dam project and in August 1958 petitioner's wife and four children moved from their Newhalem home to the house in Seattle. Petitioner, however, continued to reside in Newhalem until April 1961, when the Skagit Dam project was about completed and petitioner was transferred by his employer to Seattle. Petitioner lived with his family in his home in Seattle until about August 1961 when he was assigned by Seattle City Light as resident engineer on its Boundary Dam project on the Pend Oreille River in northeastern Washington near the Canadian border. Petitioner moved to Metaline Falls, Wash., near the Boundary Dam project, in August 1961, where he lived for 2 months in quarters furnished by his employer. In October 1961, petitioner purchased two houses in Metaline Falls, one for his family *4 to live in and the other as rental property for investment. On October 16, 1961, petitioner's wife and younger daughter joined him in Metaline Falls where they lived in the house petitioner had purchased as a residence. Petitioner's older son was attending St. Martin's Academy in Olympia, Wash. Petitioner's younger son was attending a Seattle grade school and he remained in Seattle until the end of the soccer season before joining petitioner in Metaline Falls. Petitioner's older daughter was attending Seattle University and remained in Seattle. Seattle City Light paid all of the expenses of moving petitioner and his family to Metaline Falls. On November 1, 1961, petitioner rented out a portion of his Seattle house for $75 per month. Petitioner's older daughter continued to live in a portion of this house under arrangements made with the tenant until she graduated from Seattle University in 1965. In April 1963, petitioner purchased a 175-acre farm located in the Metaline Falls area and he and his family lived in the house in Metaline Falls and on the farm up to the date of the trial. In August 1965, petitioner voluntarily terminated his employment with Seattle City Light. The Boundary *5 Dam project was formally commenced by Seattle City Light on October 30, 1953, when it filed an application with the Federal Power Commission (hereinafter referred to as the FPC) for a preliminary permit to allow Seattle City Light to explore the feasibility of building a powerplant and dam at that site. On August 30, 1954, the FPC issued to Seattle City Light the requested preliminary permit. The permit was effective for 3 years, commencing August 1, 1954. The permit granted Seattle City Light the exclusive right to study and explore the feasibility of building a dam in that general area. Some exploratory studies were immediately commenced by Seattle City Light, and after they were completed Seattle City Light filed, on July 29, 1957, an application for a license for the construction and operation of the Boundary Dam project. The Pend Oreille County Public Utility District No. 1 (hereinafter referred to as PUD) opposed Seattle City Light's application for the FPC license for the Boundary Dam project. On July 17, 1957, the PUD petitioned the FPC for a license to construct a proposed Pend Oreille River power project at "Z" Canyon, about a mile upstream from the proposed Boundary Dam *6 site. Licensing of either the Boundary Dam project or the PUD project would forbid construction of the other. The FPC rejected PUD's application on the grounds that Seattle City Light held an exclusive preliminary permit in that area. On August 27, 1957, the PUD filed a petition to intervene in the City's application and also filed an application for license for construction and operation of a dam and powerplant at a "Z" Canyon site. The PUD's petition to intervene was granted by the FPC. Operators of lead and zinc mines in the vicinity of both the "Z" Canyon and Boundary Dam sites were concerned that the proposed dams and powerplants would interfere with their operations. On October 7, 1957, the Pend Oreille Mines & Metal Co. and other mining interests filed a joint petition to intervene in the license application hearings. The FPC granted their motion. On January 19, 1959, an FPC examiner commenced prolonged hearings on the application of the PUD and Seattle City Light. Numerous hearings were held during 1959 and 1960 in Washington, D.C., and Spokane, Wash.
On March 10, 1961, after the FPC engineering staff had adopted a finding favorable to the Boundary Dam project, the FPC examiner *7 issued his initial decision granting Seattle City Light a license to construct, operate, and maintain its proposed Boundary hydroelectric project. The PUD application was denied. On July 10, 1961, the FPC adopted in major part the examiner's decision of March 10, 1961, and granted a license to Seattle City Light to construct the proposed Boundary Dam project. Acting on the PUD's application for a rehearing, the FPC, on September 6, 1961, modified its original licensing order by granting PUD 48,000 kilowatts of the proposed Boundary Dam project output at cost. This modification was accepted by Seattle City Light and the license became effective as of October 1, 1961. The license required Seattle City Light to submit design plans for the project to the FPC for approval by April 1, 1962; to commence major construction by October 1, 1962; and to have the project "on line" by October 1, 1967. Additional litigation contesting Seattle City Light's right to construct the dam continued into 1963. Upon licensing of the Boundary Dam project, Seattle City Light set up an organization within its Engineering Division, under a project manager, which was to be responsible for the work at the project *8 site. Preliminary work on the project was undertaken immediately. A contract was awarded for surveying the site and mapping project boundaries. Diamond drilling, under another contract, was required in order to determine the geological structure of the project works area in detail so that the location of project facilities could be established. Seattle City Light contracted with Pend Oreille County for the improvement of 10 miles of county road, and prepared specifications for the construction of a 1.2-mile access road to the project site. Acquisition of property and right-of-way needed for the project was commenced without delay. Several employees from the Skagit project became the nucleus of a new field unit organization within Seattle City Light's Engineering Division. This unit was stationed at the Boundary Dam site to oversee Seattle City Light's activities there. It was to this group that petitioner was assigned as resident engineer. On October 1, 1961, the Seattle City Council enacted Ordinance No. 90676, approved November 6, 1961, establishing certain positions, fixing compensation and conditions of employment, and providing funds for the Boundary hydroelectric project. The *9 ordinance, in addition to establishing other positions, authorized the appointment of a resident engineer at the salary of $13,000 a year, and petitioner, who was already informally serving in that capacity, was immediately appointed to this position by Seattle City Light. In addition, Ordinance No. 90676 included the following provision: and in addition to and as part of the compensation for each such position the encumbent shall receive $200 per month as a temporary housing allowance. The Boundary Dam project was, as of the date of trial, scheduled to be "on line" by October 1967 in accordance with the FPC license. By the end of 1962 Seattle City Light had expended $3,850,267 on construction work at the Boundary Dam site; by the end of 1963, $8,231,816; and by the end of 1964, $22,325,250. The total expected cost is presently $85 million. The first construction contract was entered into about the middle of 1963. Petitioner received $200 per month as a housing allowance starting October 1961. He included the $2,400 in "Wages" reported on his income tax return for 1962 but then deducted it as "temporary housing allowance" in reporting net "Wages" on the return. In his notice of deficiency *10 respondent determined that the $2,400 should be included in petitioner's taxable income. Petitioner included the housing allowance in his income reported on his tax returns for 1961, 1963, and 1964 and claimed no deduction therefor. Opinion The question presented is whether a $200 monthly cash housing allowance paid to petitioner by his employer during the year 1962 is includable in petitioner's taxable income for that year. Petitioner represented himself in this proceeding and we cannot ascertain from his pleadings or his brief on what section or sections of the Internal Revenue Code [2] *11 he relies for support of his position. There would seem to be little question that the payments constituted gross income to petitioner; in fact he included them in "wages" reported on his return. In Darrell Spear Courtney, 32 T.C. 334, 341, we said, "A cash allowance for food, lodging, and similar items, in addition to wages, is income within the scope of section 22(a)." There is nothing in this record to suggest that the payments here involved did not constitute additional compensation to petitioner. In fact the City ordinance authorizing the allowance characterized it as additional compensation. The only Code provision that occurs to us upon which petitioner might rely to claim that the payments should be excluded from gross income is section 119. That section provides, generally, that there shall be excluded from gross income of an employee the value of any meals or lodgings furnished to him by his employer for the convenience of the employer if, in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment. Section 1.119-1(c)(2), Income Tax Regs., provides that the exclusion provided by section 119 applies only to meals and lodgings furnished "in kind." While the statute does not specifically so provide, this would appear to be a reasonable interpretation thereof, in view of the language of the statute, which excludes the "value" of lodgings "furnished" "on the business premises of his employer," and the intent of Congress as expressed in S. Rept. No. 1622 to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., pp. 190, 191 (1954). See also Charles N. Anderson, 42 T.C. 410, on appeal (C.A. 6). Clearly *12 the lodgings were not furnished in kind by petitioner's employer. It is equally clear that the lodgings were not on the business premises of the employer. See Gordon S. Dole, 43 T.C. 697, affd. 351 F. 2d 308 (C.A. 1, 1965). Nor can it be said that the lodgings were furnished for the convenience of the employer or were required to be accepted as a condition of petitioner's employment. It is therefore patent that the payments received by petitioner were not excludable from his gross income. This leaves the question whether there is any provision of the Code which would permit petitioner to deduct the amount of these payments or any part thereof. The provisions upon which petitioner appears to rely are section 62, [3] *13 which provides a deduction for employees for expenses of travel away from home, including lodging, incurred in connection with the performance by the taxpayer of services as an employee, or sections 161 and 162, [4] *14 which provide a deduction for all ordinary and necessary business expenses, including traveling expenses (including the entire amount expended for meals and lodging) incurred while away from home in the pursuit of a trade or business. Unfortunately petitioner offered no evidence of any amount he spent for meals and lodgings while in Metaline Falls during the year 1962 and the $2,400 he deducted from gross wages reported on his return can be in no way related to actual expenditures made by petitioner for the above purposes. Consequently, respondent must prevail on this ground for failure of petitioner to carry his burden of proof. For completeness, in view of the fact that petitioner appears to be relying primarily on the argument that his employment at the Boundary Dam project was "temporary" during 1962, we will allude briefly to the evidence bearing on the question whether petitioner was "away from home" during 1962 within the purview of sections 62(2)(B) and 162(a)(2). We are firmly convinced by the evidence that petitioner would not be considered "away from home" within the intendment of those provisions as interpreted by any of the more recent court decisions. Compare Peurifoy v. Commissioner, 254 F. 2d 483, affirmed per curiam 358 U.S. 59, *15 and Harvey v. Commissioner, 283 F. 2d 491, reversing 32 T.C. 1368. Whether the word "home" as used in the statute is construed to mean business home, see Darrell Spear Courtney, supra, or "home" as understood and applied in its ordinary sense, see Wallace v. Commissioner, 144 F. 2d 407, reversing a Memorandum Opinion of this Court, makes no difference in this case. The only time petitioner either worked or lived in Seattle was for a period of about 4 months in 1961 while he was between assignments at the Skagit Dam project and the Boundary Dam project. Seattle could hardly be said to be his "home" in either connotation. On the other hand, beginning in August of 1961 and continuing until he voluntarily terminated his employment with Seattle City Light in 1965, his business post was at the Boundary Dam project and he and his family lived in a home in Metaline Falls which he owned and admittedly bought for the purpose of moving his family there. While he continued to own the house in Seattle, the only duplication of lodging expenses he could have incurred was of his own choosing and was not incurred because of the exigencies of his business. See James v. United States, 308 F. 2d 204. *16 Petitioner claims that his job at the Boundary Dam project was only temporary until the middle of 1963, because the work being done during 1962 was preliminary and investigatory, and because the litigation described in our Findings of Fact might have terminated the project at any time. Even if the job was "temporary" during 1962, petitioner had no "home" other than in Metaline Falls that he could have been away from. Furthermore, the evidence is clear that when he was assigned to the Boundary Dam project in August 1961, he was sent there as resident engineer and was expected to remain on in that capacity and at the jobsite until the project was completed, which it was anticipated would take 5 to 6 years. All of petitioner's actions, as well as the testimony of the company officials, indicate that both petitioner and the company thought he would be there for that length of time when he was first sent there. Not only was the duration of his job at Boundary Dam "indefinite" as opposed to "temporary," see Tax Court opinion in John J. Harvey, 32 T.C. 1368, 1387, but there was also a "reasonable probability known to him that he may be employed for a long period of time at his new station." *17 Harvey v. Commissioner, supra.The only uncertainty that could have been caused by either of the factors relied on by petitioner was that the job might be terminated before it was expected to terminate. The actions of both the employer and employee belie the fact that either of them considered petitioner's job at Boundary Dam to be temporary in nature in 1962. Consequently, petitioner was not in a travel status during that year and he has failed to show that he was entitled to deduct any amount for meals and lodgings while away from home in 1962. Decision will be entered for the respondent. Footnotes
1. In a Memorandum Opinion filed in 1953 this Court held that the value of these lodgings was not taxable income to petitioner for the year 1949.↩
2. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.
3. SEC. 62. ADJUSTED GROSS INCOME DEFINED. For purposes of this subtitle, the term "adjusted gross income" means, in the case of an individual, gross income minus the following deductions: * * *
(2) Trade and business deductions of employees. - * * *
(B) Expenses for travel away from home. - The deductions allowed by part VI (sec. 161 and following) which consist of expenses of travel, meals, and lodging while away from home, paid or incurred by the taxpayer in connection with the performance by him of services as an employee. (C) Transportation expenses. - The deductions allowed by part VI (sec. 161 and following) which consist of expenses of transportation paid or incurred by the taxpayer in connection with the performance by him of services as an employee. ↩
4. SEC. 161. ALLOWANCE OF DEDUCTIONS. In computing taxable income under section 63(a), there shall be allowed as deductions the items specified in this part, subject to the exceptions provided in part IX (sec. 261 and following, relating to items not deductible). SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *
(2) traveling expenses (including amounts expended for meals and lodging * * *) while away from home in the pursuit of a trade or business; * * *↩